**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN  DIVISION**

| | |
|---|---|
| PD LOGISTICS, LLC, an Illinois limited liability company; PAVLE DUROVIC; BANS, INC., an Illinois corporation; and ARSENIJE NENEZIC, <br><br> Plaintiffs, <br><br> v. <br><br> BMO BANK, N.A., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) |

JURY TRIAL DEMANDED

25 C 6559

## CLASS ACTION COMPLAINT

Plaintiffs PD Logistics, LLC, Pavle Durovic, Bans, Inc. and Arsenije Nenezic (collectively "Plaintiffs"), through their attorneys, and for their Class Action Complaint against Defendant BMO Bank, N.A., allege as follows:

## NATURE OF THE ACTION

1.      This is an action under 42 U.S.C. § 1981; the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a); and the Illinois Consumer Fraud Act, 815 ILCS § 505, *et seq*., as well as for common law breach of contract, to provide appropriate relief to Plaintiffs and the Class they seek to represent ("herein, Plaintiffs"), who are certain current and former customers of Defendant BMO Bank, N.A. (formerly, BMO Harris Bank, N.A.) (herein, "BMO"). In what is equivalent to financial institutions' discriminatory practice of "redlining", and denying mortgages to Black Americans 75 years ago, BMO has invoked this same type of unlawful discriminatory financial practice to "red line" lines of credit issued to persons of Eastern European race, ethnicity, national origin or heritage, unlawfully closing lines of credit BMO had previously issued to them because of their ethnicity, race, national origin

or heritage. Specifically, Plaintiffs, on behalf of themselves and all others situated (the "Class", as defined below) allege that BMO first solicited each of Plaintiffs and the Class in order to persuade them to take out a line of credit with BMO; and then, when it experienced fraud from a person who happened to be of Eastern European ethnicity or national origin, BMO embarked on a campaign of unilaterally cancelling the lines of credit and closing the bank accounts of large groups of its customers of Eastern European national origin, race or ethnicity, whose last name ended in "IC", because of their race, ethnicity or national origin. Plaintiffs and the putative Class seek damages, injunctive relief, punitive damages, and all available relief under each cause of action for such unlawful and discriminatory treatment during the period five years prior to the filing of this action ("The Class Period"), as tolled by the filing of a previous lawsuit[1].

## **JURISDICTION AND VENUE**

2.      Jurisdiction of this Court is invoked pursuant to 29 U.S.C. § § 1331 (federal question); and the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a) and § 1691e ("ECOA"), which expressly provides for concurrent jurisdiction under ECOA with "any… court of competent jurisdiction", consistent with established case law, *e.g., Donnelly v. Yellow Freight System, Inc.*, 874 F.2d 402 (1989). This Court's supplemental jurisdiction over Plaintiffs' state law claims are required pursuant to 28 U.S.C. § 1367, because those claims are so related to claims in the action within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution

---

[1] On December 16, 2025, Plaintiffs, who had been sued by BMO, filed a counterclaim on behalf of a putative class similarly defined as here, in the Circuit Court of Cook County, Illinois, Case No. 2024 L 08821. That matter was dismissed by the Circuit Court on May 21, 2025.

3.     Venue is proper in this Court because BMO resides in this District, and because the practices hereafter alleged to be unlawful were committed at least in part within the Northern District of Illinois.

## **PARTIES**

4.     Plaintiff PD Logistics, LLC (hereinafter "PD Logistics") is an Illinois limited liability company, primarily owned and controlled by Plaintiff Pavle Durovic (hereinafter "Durovic"), an individual and a resident of the City of Chicago, in Cook County, Illinois. Durovic is an individual of Eastern European descent, specifically Montenegrin descent. PD Logistics was issued a line of credit by BMO.

5.     Durovic also had a personal checking account and a business checking account with BMO.

6.     Plaintiff Bans, Inc. (hereinafter "Bans") is an Illinois corporation, primarily owned and controlled by Plaintiff Arsenije Nenezic (hereinafter "Nenezic"), an individual and a resident of Cook County, Illinois. Nenezic is also an individual of Eastern European descent, specifically Montenegrin descent.

7.     Bans was issued a line of credit by BMO.

8.     Nenezic also had a personal checking account and a business checking account with BMO.

**9.**     BMO is a National Bank, and a subsidiary of the Bank of Montreal (abbreviated "BMO"), a Canadian multinational investment bank and financial services company. In the United States, BMO does business as "BMO Financial Group", where it has substantial operations in the Chicago area and elsewhere in the country, where it operates BMO Bank, N.A.

## FACTUAL BACKGROUND

10.    Plaintiffs Durovic and Nenezic are "genetically part of an ethnically and physiognomically distinctive sub-grouping of homo sapiens." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 607, 107 S. Ct. 2022, 2025, 95 L. Ed. 2d 582 (1987).

11.    In approximately November of 2022, Durovic opened a business checking bank account with BMO.

12.    Once Durovic opened the bank account, he began to receive communications from BMO, encouraging him to open a line of credit with BMO on behalf of his company PD Logistics.  The communications occurred by telephone, advertising circulars, and in person communications from staff at the BMO branch located at 110 East Irving Park Road, in Roselle, Illinois.

13.    In November of 2022, Durovic responded to Defendant's solicitation and encouragement and applied for, was accepted for, and opened a business line of credit for PD Logistics with BMO pursuant to the terms of a "Letter of Agreement", a copy of which is attached as Exhibit 1.

14.    Durovic was required, as a condition of the issuance of the Letter of Agreement, and did, personally guarantee the business line of credit.

15.    The Letter of Agreement provided for the extension of a line credit in the amount of $100,000.00, with interest to be charged on all amounts drawn by PD Logistics at the rate of 1.5% over BMO's prime rate; and also provided that PD Logistics would incur an early cancellation fee of $500 should PD Logistics LLC cancel the line of credit within one year of opening the line of credit.

16.     The Letter of Agreement provides that BMO may make demand for payment at any time; but no provision of the Letter of Agreement nor any schedule thereto provides that open, available credit on the credit line may closed immediately and without notice, without any event of default having occurred.

17.     BMO intended that each Plaintiff and member of the putative Class rely on the Letter of Agreement or similar documentation as the basis upon which BMO might reasonably require Plaintiffs and the putative Class members to rely as the basis for the parties' agreement.

18.     The Letter of Agreement provides, at Schedule E, for "Events of Default".

19.     None of the "Events of Default" occurred from November, 2022 through August 17, 2023.

20.     At no time from November, 2022 through August 17, 2023 was PD Logistics ever in default under the terms of the Letter of Agreement.

21.     The Letter of Agreement provides that any demand for payment by BMO shall be made in writing, and is deemed made on the date it is sent by BMO or received by PD Logistics.

22.     The Letter of Agreement provides that, absent an event of default, PD Logistics must pay all amounts borrowed under the Letter of Agreement "within ninety (90) days following demand by BMO…"

23.     PD Logistics borrowed approximately $55,000 using its line of credit; and made payments ranging from $400 to $10,000 to BMO to reduce the principal amount it borrowed.

24.     On August 14, 2023, BMO sent a letter to PD Logistics notifying PD Logistics for the first time ever that PD Logistics must pay all amounts borrowed from BMO.  *See* Exhibit 2.

25.     On August 14, 2023, BMO also sent a letter to Durovic notifying him for the first time ever that BMO would be closing all of his business and personal accounts by September 25, 2023.  *See* Exhibit 3.

26.     Specifically, one of the August 14, 2023 letters, Exhibit 2, attached, "requested" that PD Logistics "close your deposit account(s) listed above by end of business 9/25/2023…."; that "Any amounts owed to BMO may be collected from the remaining balance…"; and that "if you have a loan, you are obligated to repay the balance and must comply with the repayment terms of the loans."  "Effective immediately, move your account and related activity to another financial institution."  The letter did not use the word "please", nor define "related activity".

27.     The second August 14, 2023 letter, attached as Exhibit 3, recited that "BMO will end its banking relationship with (you) and will not establish any new account going forward.  It is requested that you close all of your BMO accounts by end of business 9/25/2023."

28.     There are 43 days between August 14, 2023 and September 25, 2023, which is less than half of 90 days.

29.     On August 17, 2023, BMO sent a third letter to PD Logistics, attached as Exhibit 4, informing it that, "as a result of this review" - a "regular review of customer relationships and account activity" to "identify any transaction or information that may not fit within the expectations of BMO or legal requirements" - "BMO is terminating the business lending

relationship you have with the bank." Furthermore, the letter recited "What this means for you:" to include: "**You will not be able to make any credit advances on your credit line.**" (Emphasis in original.) and "If you have any outstanding balance it must be paid in full within 90 days from the date of this letter." *See* Exhibit 4.

30.    ECOA requires that a lender provide a "statement of reasons for any adverse action taken against an applicant" for credit.

31.    BMO's letter to PD Logistics stated: "BMO bank conducts regular reviews of customer, relationships and account activity for compliance and regulatory reasons. The purpose of the review is to identify any transaction or information that may not fit within our expectations or legal requirements, and therefore exceeds the risk tolerance of the bank." *See* Exhibit 2 and Exhibit 4.

32.    This language is the only attempt at any explanation by BMO to provide a statement of reasons for its action in closing the line of credit - a statement specifically required by ECOA.

33.    However, BMO did not inform PD Logistics what the transaction or information was, or what about it does not fit within BMO's expectations or legal requirements, and what about such transaction or information supposedly exceeds the risk tolerance of the bank – the very same bank that extended the line of credit to PD Logistics only nine months before that time, in the first place.

34.    In fact, BMO sent a number of such letters to a disproportionate number of its customers of Eastern European ethnicity or national origin who had obtained Letters of Agreement for a line of credit the same or similar to that of PD Logistics, and guaranteed

by individuals, similarly situated to Mr. Durovic, who were not in default under the terms of their Letters of Agreement.

35.     BMO sent to Bans a virtually identical letter to that BMO sent to PD Logistics, dated August 16, 2023; *See* Exhibit 5.

36.     BMO subsequently closed the deposit accounts which Durovic had previously used for payment of the monthly line of credit bill, making it impossible for Durovic to automatically pay the bill on the line of credit.

37.     Plaintiff Nenezic experienced very similar treatment during the Class Period, first applying for, being accepted for, and obtaining and utilizing lines of credit for his corporation, Bans, from BMO using virtually identical documentation as the Letter of Agreement referenced above, then receiving letters from BMO cancelling the line of credit, even though, like PD Logistics, Bans was never in default under the terms of the lines of credit.

38.     In August of 2023, Nenezic also received a letter from BMO advising him that BMO would be closing all of his business and personal accounts.

39.     This pattern or practice of discrimination of terminating lines of credit, the business banking relationship, the business lending relationship, and other extensions of credit from BMO and bank accounts to persons of Eastern European ethnicity, race, or national origin was, upon information and belief, subject to manual underwriting by BMO personnel.

40.     Upon information and belief, BMO experienced an episode of fraud, purportedly committed by a person who happened to be of Eastern European ethnicity or national origin, in one of its Chicago area branches.

41.     In response, BMO embarked on a campaign of unilaterally cancelling the lines of credit and bank accounts to large groups of its Eastern European foreign national customers, because of their ethnicity or national origin and because their last name ended in "IC".

42.     BMO's campaign to cancel Plaintiffs' and the putative Class' lines of credit for no legitimate or reasonable basis was a deceptive act or practice, and could not have been reasonably anticipated by Plaintiffs or the putative Class members at the time they applied for lines of credit, nor at the time they utilized such lines thereafter.

43.     BMO had no reasonable cause or suspicion to conclude that all, or any large proportion, of its customers of Eastern European ethnicity or national origin or heritage were, or were likely, fraudsters, criminals or engaged in defrauding BMO.

44.     BMO had no reasonable or objective concern about repayment of the lines of credit issued to its customers of Eastern European ethnicity or national origin whose lines it suddenly called due, since there had been no default - as defined by the definition of "default" that BMO created in its Letter of Agreement extending these lines of credit.

45.     Indeed, under ECOA, BMO was l*egally required* to provide a statement of specific reasons for the decision it made to reduce or cancel the credit lines it had made available.

46.     BMO's written explanation for its action in terminating the line of credit and/or banking relationship with its customers of Eastern European ethnicity or national origin, including Messrs. Durovic and Nenezic, was that it had purportedly "reviewed its customer relationships and account activity" "to identify any transaction or information that may not fit within the expectations of BMO or legal requirements"; and "as a result of this review,

BMO is terminating the business lending relationship you have with the bank." *See* Exhibit 2, Exhibit 4, and Exhibit 5.

47.     No further explanation was given about what relationships, what account activity, what transaction or information was reviewed, nor how it did not fit within the expectations of BMO.

48.     BMO's articulation of its explanation for the termination of the line of credit is an admission that it had no legitimate business reason for such termination.

49.     BMO's decision to terminate and cancel the lines of credit held and guaranteed by Plaintiffs has damaged Plaintiffs, (i) because Plaintiffs' ability to borrow funds to continue their business was impinged, terminated and became more costly; (ii) because Plaintiff's creditworthiness score was affected by the cancellation, inhibiting Plaintiffs' ability to borrow funds from other sources; (iii) because Plaintiffs were required to defend themselves in subsequent litigation brought by BMO against Plaintiffs for their failure to immediately pay back all funds which were advanced under the lines of credit; (iv) because Plaintiffs were forced to incur attorneys' fees and other costs to defend themselves in the lawsuits filed by BMO; and, (v) because Plaintiffs were sent to debt collection and as a result suffered from embarrassment and humiliation.

## CLASS ALLEGATIONS

50.     Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring claims on their own behalf and as representatives of all other similarly-situated individuals pursuant to Section 1981, ECOA, ICFA and common law to obtain injunctive relief and to recover statutory damages, prejudgment interest, attorneys' fees and costs, and other damages owed.

51. Section 1981 and the ECOA prohibit a creditor such as BMO from discriminating against any applicant, with respect to any aspect of a credit transaction, on the basis of race, color, ethnicity or national origin, 15 U.S.C.A. § 1691, 42 U.S.C. §1981.

52. ECOA also requires that each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor, in writing, as a matter of course to applicants against whom adverse action is taken, and to be advised of their right to receive such a statement.

53. Section 1981 likewise covers discrimination based on race, ancestry or ethnic characteristics.

54. Plaintiff seeks class certification under Rule 23 for the following class of similarly-situated persons (herein, "the Class"):

All individuals of Eastern European ethnicity or national origin or heritage, whose last names end in "-ic", and all entities owned by such individuals, that had been provided with a line of credit by BMO, or who personally guaranteed such a line of credit, and who received notification that their line of credit was being cancelled, and who were not in default, as that term is defined in BMO's Letter of Agreement, within the period five years prior to the filing of this lawsuit.

55. This action is properly maintained as a class action under Rule 23 because:

a. the class is so numerous that joinder of all members is impracticable;

b. there are questions of law or fact common to the class;

c. the representative parties will fairly and adequately protect the interests of the class;

d. the claims or defenses of the representative parties are typical of the claims or defenses of the class;

e. questions of law or fact common to class members predominate over and questions affecting only individual members; and

f. a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

See, Fed. R. Civ. P. 23(a) and (b)(3).

Numerosity.

56.     BMO touts itself as "…one of the largest commercial truck and trailer finance companies in North America…" on its website.  Both named plaintiffs are in the trucking industry.  There are over 25,000 persons of Montenegrin and Serbian nationality in the state of Illinois alone.  The total number of putative Class members likely exceeds fifty (50) individuals. The exact number of Class members can easily be determined from Defendants' business records.

Commonality

57.     There is a well-defined commonality of interest in the substantial questions of law and fact concerning and affecting the Class in that Plaintiff and all members of the Class have been harmed by BMO's failure to comply with Section 1981, ECOA, ICFA, and the terms of its own contracts with putative class members; and many have already faced litigation and deteriorated credit scores from BMO's unlawful conduct.

58.     The common questions of law and fact include, but are not limited to the following:
Whether BMO cancelled the credit lines it had extended based upon actual creditworthiness;

Whether BMO provided a statement of the specific reasons, in writing, for cancelling the credit line;

Whether BMO became aware that a putative Class member's creditworthiness actually changed from the time it extended a line of credit and the time it cancelled the line of credit;

Whether BMO provided 90 days from the date of notice of termination of the line of credit to cease using the line of credit;

Whether the violations of ECOA were committed deliberately; and

Whether the violations of ECOA were committed willfully.

59.     Plaintiffs anticipate that BMO will raise defenses to all claims that are common to the Class.

Adequacy

60.     Plaintiffs will fairly and adequately protect the interests of all members of the Class, and there are no known conflicts of interest between Plaintiffs and Class members. Plaintiffs, moreover, have retained experienced counsel who are competent in the prosecution of complex litigation and who have extensive experience acting as class counsel.

Typicality

61.     The claims asserted by Plaintiffs are typical of the Class members they seek to represent. Plaintiffs have the same interests and suffer from the same unlawful practices as the Class members.

62.     Upon information and belief, there are no other Class members who have an interest in individually controlling the prosecution of his or his individual claims, especially in light

of the difficulties involved in bringing individual litigation against a large national bank. However, if any such Class member should become known, he or she can "opt out" of this action pursuant to Rule 23(c)(2)(v).

<u>Predominance and Superiority</u>

63.     The common questions identified above predominate over any individual issues, which will relate solely to the quantum of relief due to individual Class members.  A class action is superior to other available means for the fair and efficient adjudication of this controversy because individual joinder of the parties is impracticable. Class action treatment will allow a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort and expense if these claims were brought individually.  Moreover, as the damages suffered by each Class member are relatively small in the sense pertinent to class action analysis, the expenses and burden of individual litigation would make it difficult for individual Class members to vindicate their claims.

64.     Additionally, important public interests will be served by addressing the matter as a class action. The cost to the court system and the public for the adjudication of individual litigation and claims would be substantially more than if claims are treated as a class action. Prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendant, and/or substantially impair or impede the ability of Class members to protect their interests. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can and is empowered to fashion methods to efficiently manage this action as a class action.

65.     There are questions of law or fact common to the credit applicants described in paragraph 54, even though there may be distinctions in their credit applications.

66.     Plaintiffs are similarly situated to the credit applicants described in paragraph 54, because the putative Class members and Plaintiffs were together the victims of a single decision, policy, or plan, as set forth above in ¶¶ 50-58.

67.     Plaintiffs' claims and Defendant's defenses to those claims are typical of the claims or defenses of the Class described in paragraph 54.

68.     This is not a collusive or friendly action. Plaintiffs have retained counsel experienced in complex employment litigation, and Plaintiffs and their counsel will fairly and adequately protect the interests of the Class described in paragraph 54.

## <u>COUNT I</u>

### Violation of 42 U.S.C. § 1981 – Equal Rights Under the Law

69.     Plaintiffs and the Class reallege and incorporate by reference Paragraphs 1 through 68 as Paragraph 1-68 of this Count I; and bring this Count I on behalf of themselves and the Class.

70.     At all times relevant, there was in effect a federal statute, Equal Rights Under the Law, 42 U.S.C. § 1981, *et seq*. (herein, "1981"), which provides, *inter alia*:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

71.     The U.S. Supreme Court has construed Section 1981 to forbid all "racial" discrimination in the making of private as well as public contracts. *Runyon v. McCrary*, 427 U.S. 160, 168, 174–175, 96 S.Ct. 2586, 2593, 2596–2597, 49 L.Ed.2d 415 (1976); *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609, 107 S. Ct. 2022, 2026, 95 L. Ed. 2d 582 (1987).

72.     Section 1981 is designed to prevent discrimination on the basis of national origin, ethnicity or race.  It applies to discriminatory lending practices.

73.     Section 1981 makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race, color, ethnicity or national origin.

74.     Section 1981 applies to commercial loans as well as personal loans.

75.     Section 1981 obligates commercial enterprises to extend the same treatment to contractual customers regardless of race.

76.     Plaintiffs and the putative Class are members of an ethnic or racial minority.

77.     BMO was aware that Plaintiffs and members of the putative Class were members of an ethnic or racial minority, and intentionally discriminated against them because of their ethnicity or race.

78.     BMO's discriminatory treatment of Plaintiffs and the putative Class members affected their right to make and enforce contracts.

79.     Plaintiffs and the putative Class members applied for and were qualified for credit from BMO; they were denied credit; and there exists a causal nexus between the harm caused to Plaintiffs and the putative Class by the denial of credit and the plaintiffs' protected class status.

80.     BMO was aware, or should have been aware, that it is illegal to treat a borrower differently and/or to terminate a borrower's line of credit because of the borrower's race, ethnicity or national origin.

81.     During the period of time five years prior to the filing of this Complaint, BMO experienced one or more events of fraud, by a person who happened to be of Eastern European ethnicity or national origin.

82.     Therefore, and thereafter, BMO undertook an intentional and deliberate effort to terminate banking relationships with persons of Eastern European ethnicity or national origin, and with entities owned or operated by persons of Eastern European ethnicity or national origin, and to terminate lines of credit similar to the Letter of Agreement of PD Logistics and of Bans, because of, and on the basis of their ethnicity or national origin.

83.     BMO's actions as set forth above were willful, intentional and/or made in reckless disregard of Plaintiffs' rights.

84.     BMO's conduct as described above constitutes a willful violation of Section 1981.

85. BMO's decision to terminate and cancel the lines of credit held and guaranteed by Plaintiffs has damaged Plaintiffs, because (i) Plaintiffs' ability to borrow funds to continue their business was impinged, terminated or became more costly; (ii) because Plaintiff's creditworthiness score was affected by the cancellation, inhibiting Plaintiffs' ability to borrow funds from other sources; (iii) because Plaintiffs were required to defend themselves in subsequent litigation brought by BMO against Plaintiffs for their failure to immediately pay back all funds which were advanced under the lines of credit; (iv) because Plaintiffs were forced to incur attorneys' fees and other costs to defend themselves in the lawsuits filed by BMO; and, (v) because Plaintiffs were sent to debt collection and as a result suffered from embarrassment and humiliation.

WHEREFORE, Plaintiffs and the Class pray for the entry of an order entering judgment against Defendant BMO, and awarding Plaintiffs and the Class the following relief:

a. Certifying this matter as a class action pursuant to Rule 23, and preliminarily appointing counsel for Plaintiffs as counsel for the Class;

b. Injunctive relief, immediately stopping the denial of applicants for credit based upon their Eastern European ethnicity, national origin or heritage, and reinstating all credit applications of the Class Members that have been cancelled during the Class Period;

c. An award of actual damages incurred by each Class member that has been incurred as a direct and proximate result of the cancellation of the line of credit previously extended;

d. An award of compensatory damages for emotional pain, suffering, inconvenience, mental anguish, and future pecuniary loss because of the discrimination suffered by the Class member;

e. An award of punitive damages in the maximum amount permitted by law which will serve to punish and deter Defendant and to deter others from such acts in the future;

f. An award of costs and reasonable attorneys' fees incurred, in addition to, and not as a part of, all amounts awarded above, based on either lodestar with an enhancement award, or a percentage of the recovery;

g. Pre- and post-judgment interest on all amounts awarded above; and

h. Such other legal and equitable relief as this Court may deem proper.

## COUNT II

### Violation of ECOA – Discrimination Based on National Origin

86. Plaintiffs and the Class reallege and incorporate by reference Paragraphs 1 through 85 as Paragraph 1-85 of this Count II; and bring this Count II on behalf of themselves and the Class.

87. At all times relevant, there was in effect a federal statute, the Equal Credit Opportunity Act, as amended, 15 U.S.C. § 1691, *et seq*., (herein, "ECOA") which provides as follows:

15 U.S.C. § 1691:

(a) <u>Activities constituting discrimination</u> It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—

(1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract);

(2) because all or part of the applicant's income derives from any public assistance program; or

(3) because the applicant has in good faith exercised any right under this chapter.

15 U.S.C. § 1691(a)

(a) <u>Individual or class action for actual damages</u> Any creditor who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved

applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class.

(b) <u>Recovery of punitive damages in individual and class action for actual damages; exemptions; maximum amount of punitive damages in individual actions; limitation on total recovery in class actions; factors determining amount of award</u> Any creditor, other than a government or governmental subdivision or agency, who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved applicant for punitive damages in an amount not greater than $10,000, in addition to any actual damages provided in subsection (a), except that in the case of a class action the total recovery under this subsection shall not exceed the lesser of $500,000 or 1 per centum of the net worth of the creditor. In determining the amount of such damages in any action, the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional.

(c) <u>Action for equitable and declaratory relief</u> Upon application by an aggrieved applicant, the appropriate United States district court or any other court of competent jurisdiction may grant such equitable and declaratory relief as is necessary to enforce the requirements imposed under this subchapter.

(d) <u>Recovery of costs and attorney fees</u> In the case of any successful action under subsection (a), (b), or (c), the costs of the action, together with a reasonable attorney's fee as determined by the court, shall be added to any damages awarded by the court under such subsection.

15 U.S.C.A. § 1691e.

88.     ECOA is designed to prevent discriminatory lending practices; and must be construed broadly to effectuate its purpose of ending discrimination in credit applications.

89.     ECOA makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race, color, religion, national origin, sex, or marital status.

90.     ECOA applies to commercial loans as well as personal loans.

91.     Plaintiffs were applicants for credit, as those terms are defined in ECOA.

92.     BMO was aware, or should have been aware, of ECOA and that it is illegal to treat a borrower differently and/or to terminate a borrower's line of credit because of the borrower's national origin.

93.     During the period of time five years prior to the filing of this Counter Complaint, BMO experienced one or more events of fraud, by a person who happened to be of Eastern European ethnicity or national origin.

94.     Therefore, and thereafter, BMO undertook a deliberate effort to terminate banking relationships with persons of Eastern European ethnicity or national origin, and with entities owned or operated by persons of Eastern European ethnicity or national origin, and to terminate lines of credit similar to the Letter of Agreement of PD Logistics and of Bans because of, and on the basis of their ethnicity or national origin.

95.     BMO's actions as set forth above were willful, intentional and/or made in reckless disregard of Plaintiffs' rights.

96.     BMO's conduct as described above constitutes a willful violation of ECOA.

97.     BMO's decision to terminate and cancel the lines of credit held and guaranteed by Plaintiffs has damaged Plaintiffs, because (i) Plaintiffs' ability to borrow funds to continue their business was impinged, terminated or became more costly; (ii) because Plaintiff's creditworthiness score was affected by the cancellation, inhibiting Plaintiffs'

ability to borrow funds from other sources; (iii) because Plaintiffs were required to defend themselves in subsequent litigation brought by BMO against Plaintiffs for their failure to immediately pay back all funds which were advanced under the lines of credit; (iv) because Plaintiffs were forced to incur attorneys' fees and other costs to defend themselves in the lawsuits filed by BMO; and, (v) because Plaintiffs were sent to debt collection and as a result suffered from embarrassment and humiliation.

WHEREFORE, Plaintiffs and the Class pray for the entry of an order entering judgment against Defendant BMO, and awarding Plaintiffs and the Class the following relief:

i.  Certifying this matter as a class action pursuant to Rule 23, and preliminarily appointing counsel for Plaintiffs as counsel for the Class;

j.  Injunctive relief, immediately stopping the denial of applicants for credit based upon their Eastern European ethnicity, national origin or heritage, and reinstating all credit applications of the Class Members that have been cancelled during the Class Period;

k.  An award of actual damages incurred by each Class member that has been incurred as a direct and proximate result of the cancellation of the line of credit previously extended;

l.  An award of compensatory damages for emotional pain, suffering, inconvenience, mental anguish, and future pecuniary loss because of the discrimination suffered by the Class member;

m.  An award of punitive damages in the maximum amount permitted by ECOA which will serve to punish and deter Defendant and to deter others from such acts in the future;

n. An award of costs and reasonable attorneys' fees incurred, in addition to, and not as a part of, all amounts awarded above, based on either lodestar with an enhancement award, or a percentage of the recovery;

o. Pre- and post-judgment interest on all amounts awarded above; and

p. Such other legal and equitable relief as this Court may deem proper.

## COUNT III

### Breach of Contract

97. Plaintiffs and the Class reallege and incorporate by reference Paragraphs 1 through 96 as Paragraph 1-96 of this Count III; and bring this Count III on behalf of themselves and the Class.

98. BMO agreed to provide Plaintiffs and the Class with a line of credit, on the terms set forth in Letter of Agreement, including those terms set forth above in paragraphs 13-22.

99. Plaintiffs and the Class accepted BMO's offer, and paid valuable consideration, including fees and interest, in exchange for the ability to draw funds on a line of credit, pursuant to those terms.

100. BMO breached the parties' agreement by calling the line of credit due within less than 90 days after notifying Defendants and the Class of the cancellation of the line of credit.

101. BMO breached the parties' agreement by cancelling Plaintiffs' ability to draw on the line of credit less than 90 days after notifying Defendants and the Class of the cancellation of the line of credit.

102.    As a result of BMO's breach, Plaintiffs were damaged as a direct and proximate result of Defendant's premature cancellation of and premature termination of the contractual right to continue to use the line of credit issued, because they could no longer draw on the line of credit, and because BMO wrongfully required payment by Plaintiffs and the Class prematurely.

103.    Further, as a result of BMO's breach, Plaintiffs were damaged because (i) Plaintiffs' ability to borrow funds to continue their business was impinged, terminated or became more costly; (ii) because Plaintiff's creditworthiness score was affected by the cancellation, inhibiting Plaintiffs' ability to borrow funds from other sources; (iii) because Plaintiffs were required to defend themselves in subsequent litigation brought by BMO against Plaintiffs for their failure to immediately pay back all funds which were advanced under the lines of credit; (iv) because Plaintiffs were forced to incur attorneys' fees and other costs to defend themselves in the lawsuits filed by BMO; and, (v) because Plaintiffs were sent to debt collection and as a result suffered from embarrassment and humiliation.

WHEREFORE, Plaintiffs and the Class pray for the entry of an order entering judgment against Defendant BMO, and awarding Plaintiffs and the Class the following relief:

q.  Certifying this matter as a class action pursuant to 735 ILCS § 2-801, *et seq.* and preliminarily appointing counsel for Plaintiffs as counsel for the Class;

r.  Injunctive relief, immediately stopping the denial of applicants for credit based upon their Eastern European ethnicity, national origin or heritage, and reinstating all credit applications of the Class Members that have been cancelled during the Class Period;

s.  An award of consequential damages incurred by each Class member that has been incurred as a direct and proximate result of the cancellation of the line of credit previously extended;

t.  Pre- and post-judgment interest on all amounts awarded above; and

u.  Such other legal and equitable relief as this Court may deem proper.

## COUNT IV

**Violation of Illinois Consumer Fraud & Deceptive Trade Practices Act**
**(815 ILCS 505/1 *et seq.*)**

104.  Plaintiffs and the Class reallege and incorporate by reference Paragraphs 1 through 103 as Paragraph 1-103 of this Count IV; and bring this Count IV on behalf of themselves and the Class.

105.  Plaintiffs bring this claim for violation of the Illinois Consumer Fraud & Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("CFA"), on behalf of the Class.

106.  The CFA is "a regulatory and remedial statute intended to protect consumers, **borrowers**, **and business people** against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Pantoja-Cahue v. Ford Motor Credit Co.*, 375 Ill. App. 3d 49, 60, 872 N.E.2d 1039, 1048 (2007).

107.  The circumstances giving rise to Plaintiffs and the Class members' allegations include BMO's policies regarding the issuing, cancelling and/or maintaining retail lines of credit to the general public.

108.  Under the CFA, unfair or deceptive acts or practices include the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of

any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", 815 ILCS 505/2.

109.    By engaging in the acts and practices described herein, Defendant has committed one or more acts of "unfair competition" as the CFA defines the term.

110.    BMO committed, and continue to commit, "unlawful" business acts or practices by, among other things, violating the ECOA, 15 U.S.C. § 1691(d), and Regulation B, 12 C.F.R. § 1002.9(a)-(b); and § 1036(a)(1)(A) of the Consumer Financial Protection Act, 12 U.S.C. §§ 5481(12)(D), (14), 5536(a)(1)(A); 15 U.S.C. § 1691c (b) as described herein.

111.    BMO committed, and continue to commit, "unfair" business acts or practices by, among other things:

        a. Engaging in conduct for which the utility of the conduct, if any, is outweighed by the gravity of the consequences to Plaintiff and the members of the Class;

        b. Engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs and the members of the Class; and

        c. Engaging in conduct that undermines or violates the spirit or intent of the consumer protection laws that this Class Action Complaint invokes.

112.    BMO has committed unlawful, unfair, and/or fraudulent business acts or practices by, among other things, engaging in conduct BMO knew or should have known was likely to and do deceive reasonable borrowers and businessmen, including Plaintiffs and the Class members.

113.    As detailed above, BMO's unlawful, unfair, and/or fraudulent practices include making false and/or misleading representations that the retail services line of credit terms were violated; that BMO could immediately cancel the use of the line of credit with no

advance notice; that BMO could call all amounts due under any line of credit in less than 90 days; and, that BMO would not cancel the lines of credit and demand expedited repayment as long Plaintiffs made the minimum payments required under the credit line.

114.    BMO's fraudulent, unlawful and unfair business practices and false and misleading representations, omissions, and conduct of BMO were made with the intent for Plaintiffs and the Class members to rely on them and to induce Plaintiffs the Class members to obtain the services and rely upon the services and products of BMO and that Plaintiffs and the Class members justifiably relied upon BMO to fulfill its obligations and promises and to abstain from conduct that would harm them.

115.    BMO's actions occurred in the conduct of "trade and commerce" as it relates to BMO's issuing, cancelling and/or maintaining retail lines of credit to the general public.

116.    Plaintiffs and the Class members are injured in fact and have lost and continue to lose money as a result of BMO's conduct of improperly denying or revoking credit for lines of credit.

117.    Plaintiffs and the Class were denied credit, either through the denial of an application for retail services lines of credit and/or having an existing line of credit revoked.

118.    Further, Plaintiffs were damaged because (i) Plaintiffs' ability to borrow funds to continue their business was impinged, terminated or became more costly; (ii) because Plaintiff's creditworthiness score was affected by the cancellation, inhibiting Plaintiffs' ability to borrow funds from other sources; (iii) because Plaintiffs were required to defend themselves in subsequent litigation brought by BMO against Plaintiffs for their failure to immediately pay back all funds which were advanced under the lines of credit; (iv) because Plaintiffs were forced to incur attorneys' fees and other costs to defend themselves in the

lawsuits filed by BMO; and, (v) because Plaintiffs were sent to debt collection and as a result suffered from embarrassment and humiliation.

WHEREFORE, Plaintiffs and the Class pray for the entry of an order entering judgment against Defendant BMO, and awarding Plaintiffs and the Class the following relief:

      i.     Certifying this matter as a class action pursuant to 735 ILCS § 2-801, et seq. and preliminarily appointing counsel for Plaintiffs as counsel for the Class;

      ii.     Injunctive relief, immediately stopping the denial of applicants for credit based upon their Eastern European ethnicity, national origin or heritage, and reinstating all credit applications of the Class Members that have been cancelled during the Class Period;

      iii.    An award of actual damages incurred by each Class member that has been incurred as a direct and proximate result of the cancellation of the line of credit previously extended;

      iv.    An award of compensatory damages for emotional pain, suffering, inconvenience, mental anguish, and future pecuniary loss because of the discrimination suffered by the Class member;

      v.     An award of punitive damages in the maximum amount permitted by ECOA which will serve to punish and deter Defendant and to deter others from such acts in the future;

      vi.    An award of costs and reasonable attorneys' fees incurred, in addition to, and not as a part of, all amounts awarded above, based on either lodestar with an enhancement award, or a percentage of the recovery;

      vii.   Pre- and post-judgment interest on all amounts awarded above; and

      viii.  Such other legal and equitable relief as this Court may deem proper.

Respectfully submitted,

/s/ Jeffrey Grant Brown
Attorney for Plaintiffs

Jeffrey Grant Brown
Jeffrey Grant Brown, P.C.
65 West Jackson Blvd.
Suite 107
Chicago, Illinois 60604
(312) 789-9700
jeff@JGBrownlaw.com
ARDC No.: 6194262

Angel Bakov
Bakov Law, Ltd.
One East Wacker Drive
Suite 2510
Chicago, Illinois 60601
(312) 880-1008
abakov@bakovlaw.com
ARDC No.: 6308535