**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PD LOGISTICS, LLC, an Illinois limited liability company; PAVLE DUROVIC; BANS, INC., an Illinois corporation; and ARSENIJE NENEZIC,** | ) | |
| **Plaintiffs and Counter-Defendants,** | ) | **Case No. 25-cv-06559** |
| **v.** | ) | **Judge Sharon Johnson Coleman** |
| **BMO BANK N.A.,** | ) | **Magistrate Judge Laura K. McNally** |
| **Defendant and Counter-Plaintiff.** | ) | |

# DEFENDANT BMO BANK N.A.'S MOTION TO COMPEL AND FOR SANCTIONS

Defendant/Counter-Plaintiff BMO Bank N.A. ("BMO") moves under Rule 37 and Local Rule 37.2 to compel Plaintiff Bans, Inc. ("Bans") to produce all electronically stored information ("ESI") responsive to BMO's Requests and to sanction Bans and its counsel:

## INTRODUCTION

This is the second time in this case that BMO has had to ask the Court for the same thing. Recently, BMO moved to compel Plaintiff PD Logistics, LLC ("PD") to produce the ordinary emails of an ordinary business—emails PD's counsel had repeatedly sworn did not exist, until PD's own deposition proved otherwise. See Doc. 87. Bans, represented

by the very same lawyers, has now run the very same play. And the story here is not better. It is worse.

Start with what Bans has produced. In nearly a year of discovery, Bans has turned over exactly six emails. Every one of them is a message to or from BMO—documents the Bank already had. That is the entire ESI production of a company that hauls freight across the country, invoices for its work, insures a fleet of trucks and trailers, registers those vehicles with the State, files taxes, and gets paid every week by wire and ACH. A business like that runs on email. Bans's production suggests it runs on almost none.

Bans's own testimony gives up the game. Its Rule 30(b)(6) witness testified that Bans uses several email accounts to conduct business; that it receives load assignments, work details, and payment communications by email; that it receives—and has kept—weekly settlement and fuel-transaction statements from the carriers it drives under; that it receives insurance certificates and communications from its insurance agency by email; that it receives vehicle-registration materials by email; and that it emails with its accountants about its taxes. Bans testified that it has saved these business records since the

day Bans's owner first got his commercial driver's license. None of it has been produced.

Why not? Because no real search ever happened. Bans's witness testified that he collected the documents himself, alone, and that when he searched his email he typed in two phrases and only two: "BMO loan" and "BMO letter." A search for "BMO" will of course find emails with BMO. It will find nothing else. That is not a search for responsive ESI; it is a search designed—intentionally or not—to surface the six documents Bans produced and to miss everything else its witness admitted exists.

If this sounds familiar, it should. It is the same pattern set forth in Doc. 87: sworn assurances of completeness, a client-run "search" no lawyer supervised, and a production that materialized only when a deposition made the gaps impossible to deny. Twice now, the same counsel have certified that the same plaintiffs have produced everything, and twice the plaintiffs' own testimony has shown that they have not. Whatever the label—oversight, inattention, or something more—it is a practice, not an accident.

Bans cannot excuse any of this by pointing to the clock. While its ESI sat unsearched, Bans insisted that discovery stay on schedule and opposed BMO's request for more time. Having demanded speed, Bans cannot now hide behind the calendar. The Court should order Bans to produce its ESI, order a qualified vendor to do the collection Bans and its counsel would not, and shift to Bans and its counsel the costs of a fight they made necessary.

## BACKGROUND

### 1. Procedural History

#### a. Pleadings

Plaintiffs filed this putative class action on June 12, 2025, alleging that BMO discriminated against them and a proposed class of trucking customers by terminating certain banking relationships because of concerns about their account activity. Doc. 1. On March 4, 2026, the Court dismissed the contract and Illinois Consumer Fraud and Deceptive Business Practices Act claims but allowed the Equal Credit Opportunity Act ("ECOA") and 42 U.S.C. § 1981 claims to proceed. Doc. 35. BMO answered and asserted fraud and RICO counterclaims on March 19, 2026. Doc. 36. Plaintiffs' April 8, 2026 motion to dismiss

those counterclaims is fully briefed and pending. Doc. 42. Plaintiffs moved for partial summary judgment under ECOA on May 8, 2026, and for class certification on May 18, 2026. Docs. 60, 63. BMO responded on August 25, 2026, and Plaintiffs' replies are due September 15, 2026. Doc. 65.

### b. Discovery Deadlines

The Court initially set June 26, 2026 as the fact-discovery deadline. Doc. 16. After Plaintiffs declined a joint extension, BMO moved to extend discovery (Doc. 47), which Plaintiffs opposed. The Court extended discovery on BMO's fraud and RICO claims through September 30, 2026, while leaving June 26, 2026 as the deadline for discovery on Plaintiffs' claims. Doc. 49.

## 2. Discovery History

The paper trail is long, and it points one way. On August 22, 2025, Plaintiffs served their Rule 26(a)(1) Disclosures. See Rule 26(a)(1) Disclosures attached hereto as **Exhibit 1**. Rule 26(a)(1)(A)(ii) required Plaintiffs to identify their categories of ESI. They identified none of Bans's—pointing only to "electronically stored information from BMO."

Ex. 1. Bans said nothing about the several email accounts through which its representative would later testify he runs the business and keeps his records.

On August 29, 2025, BMO served its First Requests for Production of Documents and First Set of Interrogatories to Bans, attached hereto as **Exhibit 2**. BMO left no doubt that it wanted ESI. It defined "Communication" to include "electronic mail, text message, instant message, chat message, internet posting, social posting or other transfer of information," and defined "Document" as broadly as the Federal Rules allow. Ex. 2. And it asked for the obvious categories: the transactions funded by the BMO loan; Bans's operations and business transactions; its structure, formation, and governance; its regulatory compliance; its debts and liabilities; its capitalization and funding; its ownership and use of vehicles; its banking relationships and account closures; its knowledge of investigations into Eastern European individuals or entities; and the materials it reviewed to answer discovery. See Ex. 2.

On September 30, 2025, Bans answered—with boilerplate objections and little else. See **Exhibit 3**. On requests that plainly called

for ESI, Bans produced a handful of emails with BMO employees. Those were documents BMO already had. Ex. 3.

The empty ESI production troubled BMO, and it said so. On October 16, 2025, BMO opened the meet-and-confer process. See October 16, 2025 letter attached hereto as **Exhibit 4**. The parties conferred by video on October 24, 2025. Bans supplemented—and again produced no ESI. See Amended Responses attached hereto as **Exhibit 5**.

Counsel conferred again by video on January 12, 2026. On February 26, 2026, BMO sent a follow-up Rule 37 letter, attached hereto as **Exhibit 6**. BMO reminded Bans that its requests reached ESI and that Bans had produced almost none—just a few emails, and only with BMO—even as it pressed a class action in federal court. Id. BMO again demanded Bans's ESI. Id.

Bans's answer was categorical. Its counsel wrote that "Plaintiffs have produced all emails in their possession that are relevant to this proceeding" and that "Plaintiffs can confirm that they do not possess any additional electronically stored documents." See March 16, 2026 correspondence attached hereto as **Exhibit 7**. Counsel also fixed Bans's

relevant period as April 1, 2022 through August 31, 2023. Id. As the deposition would show, the assurance of completeness was wrong.

BMO tried once more, by letter dated April 15, 2026, attached hereto as **Exhibit 8**. BMO warned that neither Bans nor its counsel appeared to have made the reasonable inquiry the Rules require, and it reminded counsel of their independent obligations under Rule 26(g). Id.

On April 28, 2026, Bans served Second Amended Responses. Again, no emails, no text messages, no ESI beyond its BMO correspondence. See **Exhibit 9**. And this time Bans's owner and Rule 30(b)(6) designee, Arsenije Nenezic, verified the responses under oath—swearing to the completeness of a production that his own deposition would soon contradict. Ex. 9.

Then came the eve-of-deposition production. With Bans's Rule 30(b)(6) deposition set for July 21, 2026, Bans served Third Amended Responses on July 16, 2026 and dumped additional materials. See **Exhibit 10**. The timing forced the deposition to slip to August 11, 2026. Yet, the late production did not cure Bans's glaring ESI deficiencies: still no operational emails, no carrier settlements or fuel statements

related emails, no insurance related emails, no registration related emails, no accountant related emails, and no text messages.

The deposition, when it finally happened on August 11, 2026, laid the deficiency bare. Bans testified that it uses email in the ordinary course and keeps several accounts for the purpose, including *Arsenijenen@gmail.com* and *Bans.freight@gmail.com*. See Ex. 11 (Nenezic Dep.) at 20:8–21:24. It receives work communications by email, including load details and requests, and stores those emails on its phone. Id. at 22:2–6. It receives—and has saved since Mr. Nenezic first got his CDL—weekly settlement statements and fuel-transaction reports by email from the carriers whose authority it drives under, USA Freight and JB Freight. Id. at 43:6–13; 45:1–23; 66:24–67:11; 70:13–20. It receives insurance certificates and communications by email from Custom Insurance Agency. Id. at 38:6–39:11; 100:4–101:2. It receives registration materials by email, including from Alpha Trucking Solutions and through the IRP process. Id. at 49:19–50:14; 55:5–16. And it emails its accountants about its taxes. Id. at 208:11–16. Bans called all of these important business records that it routinely keeps. Id.

BMO then asked how Bans had searched. The answer is the heart of this motion. Bans testified that no one but its owner collected documents, and that he alone searched the email accounts. Ex. 11 at 94:16–21. When BMO asked what terms he used, he named two: "BMO loan" and "BMO letter." Id. at 92:11–93:13. That is why the only emails Bans produced are emails with BMO. Bans never looked for anything else. And Bans's own witness confirmed that his attorneys did not have access to his records, testifying that they could not have sent him his own bank statements "because they don't even have access to this." Id. at 19:11–15. On this record, counsel could not have run or verified the search.

That is the same failure, by the same counsel, that produced Doc. 87. There, PD's counsel certified completeness while PD self-collected without supervision, and the truth emerged only at PD's deposition. See Doc. 87 at 5–9. Here, Bans's counsel certified completeness while Bans self-collected without supervision, and the truth emerged only at Bans's deposition. The repetition matters. Under Rule 26(g), the duty to make a reasonable inquiry falls on counsel—and a mistake counsel makes

once might be an oversight, but a mistake counsel makes twice, in the same case, for the same clients, is a method.

Bans's ESI production remains a shell. It has produced six emails, all with BMO, and nothing of the work, carrier, insurance, registration, or tax communications its witness swore it keeps. Nor has it produced a single text message, even though BMO learned at the deposition of Veles Transport—a carrier Plaintiffs did business with—that drivers routinely communicate with dispatch and safety personnel by text and messaging apps. These gaps are not close calls. This motion follows, along with the required Declaration of Jeffrey Jamison attached hereto as **Exhibit 12**.

## ARGUMENT

### A. Standard of Review

#### 1. Rule 37

Rule 37 permits a motion to compel when a party fails to respond or provides an insufficient response. *Thorsen v. Comty Unit Sch. Dist.*, No. 20 C 50132, 2023 WL 11983957, *2 (N.D. Ill. 2023) (J. Schneider);

*DR Distributors, LLC v. 21st Century Smoking Inc.*, 513 F. Supp. 3d 839, 954 (N.D. Ill. 2021); Fed. R. Civ. P. 37(a)(4). District courts have broad discretion and liberally construe the discovery rules. *Thorsen*, 2023 WL 11983957, at *2. If the motion is granted, the non-complying party, its attorney, or both must pay reasonable expenses and fees unless the position was substantially justified or an award would be unjust. *DR Distributors, LLC*, 513 F. Supp. 3d at 954–55. The rule mandates fees absent those exceptions. Id.; see also *Guster-Hines v. McDonald's USA, LLC*, No. 20 CV 117, 2025 WL 777507, at *5 (N.D. Ill. 2025) (J. McNally).

**2. Rule 26**

Rule 26(a)(1)(A)(ii) requires disclosure, without awaiting a request, of documents and ESI in a party's possession, custody, or control that it may use to support its claims or defenses. Fed. R. Civ. P. 26(a)(1)(A)(ii). Under Rule 26(g), counsel's signature certifies, after reasonable inquiry, that a disclosure is complete and correct. An unjustified violation requires an appropriate sanction, including expenses and fees. Fed. R. Civ. P. 26(g). Sanctions are mandatory,

though their form is discretionary. *DR Distributors, LLC*, 513 F. Supp. 3d at 953.

### B. Bans should be ordered to produce its ESI and pay BMO's costs.

The stakes here are not merely procedural. BMO's counterclaims allege that Bans and more than fifteen other borrowers participated in a coordinated scheme to defraud the Bank—common-law fraud and civil RICO under 18 U.S.C. §§ 1962(c) and (d)—by obtaining commercial loans through false representations about their businesses and the intended use of proceeds, and by moving those proceeds through a network of shared registered agents, tax preparers, insurers, and affiliated carriers. (Doc. 36, Countercls. ¶¶ 11–15, 43–47.) The emails Bans has withheld go to the core of those claims. Fraudulent intent is rarely admitted and is almost always proven circumstantially, through the actor's own contemporaneous communications; a RICO "pattern" requires related predicate acts plus continuity, *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 239 (1989); and an association-in-fact enterprise is established through the "relationships among those associated with the enterprise" and their coordinated conduct, *Boyle v. United States*, 556 U.S. 938, 946 (2009). Bans's ordinary-course emails—with the carriers

under whose authority it operates, with the registration and insurance agents it shares with other borrowers, and with the accountants who prepared its filings—are the very communications from which the existence, relationships, and continuity of the alleged enterprise will be proven or disproven. (See Doc. 36, Countercls. ¶¶ 15(c), 38, 44 (shared agents and tax preparers as hallmarks of the enterprise).) Indeed, because BMO's predicate acts expressly include "electronic communications among Enterprise members coordinating the scheme," certain of those emails may themselves be instrumentalities of the wire-fraud offense, not merely evidence of it. (Doc. 36, Countercls. ¶ 47.) The same communications bear directly on BMO's affirmative defenses of unclean hands and setoff. (Doc. 36, Fifteenth & Sixteenth Affirmative Defenses.)

Proportionality confirms what relevance already establishes. Rule 26(b)(1) directs the Court to weigh, among other factors, "the importance of the issues at stake," "the amount in controversy," and "the parties' relative access to relevant information." Fed. R. Civ. P. 26(b)(1). Each favors production. BMO's counterclaims seek treble damages of $4,500,000 and turn on proof of a fraudulent scheme. (Doc.

36, Countercls. ¶ 74.) *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (discovery relevance construed broadly to encompass any matter bearing on a claim or defense). And access is entirely one-sided: the responsive emails sit exclusively in Bans's own accounts, beyond BMO's reach absent the production the Court is asked to compel. Where the proof of a fraud lies in the alleged wrongdoer's own hands, the party seeking it should not be left to the wrongdoer's assurance that nothing exists.

The order BMO asks for follows from facts Bans has admitted. Bans claims to run an ongoing trucking business, and its witness testified that it runs that business on email. Yet Bans disclosed none of its own ESI under Rule 26(a)(1), gave boilerplate objections to requests that plainly reached ESI, and then certified—through counsel and through a sworn verification—that it had searched fully and produced everything. What it had actually produced was six emails with BMO.

The certifications were not accurate, and the deposition showed why. Bans conducts its business through several email accounts; it receives and keeps work, payment, carrier-settlement, fuel, insurance, registration, and accountant communications; and it collected

documents through a single custodian who ran two BMO-specific search terms and stopped. A search built to find "BMO" will return emails with BMO and nothing more. It is no search at all for the responsive, non-BMO ESI that Bans's own witness confirmed exists—and on the witness's own testimony that his attorneys lacked access to his records, no lawyer was positioned to run or verify it.

None of this is cured by the passage of time or by Bans's belated, eve-of-deposition production, which added no meaningful ESI. This is not a garden-variety dispute over the edges of a production. It is a wholesale failure to look for responsive information in a federal case in which Bans seeks to represent a class. Because Bans's responses remain incomplete after nearly a year of BMO's efforts, the Court should order Bans to produce all responsive ESI now and award BMO the reasonable fees and expenses it was forced to spend chasing discovery Bans owed all along.

### C. The Court Should Order Retention of an ESI Vendor.

Rule 26(g) puts the duty of reasonable inquiry on counsel, and counsel did not meet it. Bans's lawyers signed initial and amended responses, told BMO that all responsive emails had been produced, and

tendered a client verification of completeness. Then Bans's testimony revealed whole categories of communications that no one had ever searched for, let alone produced. Even today the production is six BMO emails—no daily business communications, no carrier settlement or fuel statements, no insurance communications, no registration communications, no accountant communications, and no texts about Bans's trucking operations.

This Court has explained what the Rules demand. In *DR Distributors, LLC*, 513 F. Supp. 3d 839, it examined counsel's ESI obligations and sanctioned counsel for missing them, observing: "Counsel must be competent in their knowledge and ability to identify, preserve, collect, review, and produce ESI. Competence pervades every aspect of the ESI discovery process. This is not a new requirement." Id. at 942. The Court held that "attorneys have an obligation to investigate their client's information management system thoroughly to locate potentially relevant and discoverable material … such an investigation goes well beyond simply asking the client for the relevant files and trusting that the client itself has a complete understanding of its own information technology structure." Id. That is precisely what did not

happen here—and, per Doc. 87, precisely what did not happen with PD either.

A self-collection that produced only "BMO" hits, run by a single custodian whose own testimony was that his attorneys lacked access to his records, is not a foundation the Court or BMO can trust. Ordering Bans to try again on its own would just repeat the process that created the problem. Courts confronted with that risk turn to a neutral. Where a party has shown it cannot or will not competently search for and produce ESI, retention of a qualified third-party vendor is an appropriate and proportional remedy. See *Seven Seas Cruises S. De R.L. v. V. Ships Leisure SAM*, No. 09-23411-CV, 2011 WL 772855, at *4 (S.D. Fla. Feb. 19, 2011) (ordering a vendor where the failure "is the result of a lack of familiarity and/or training in searching for and producing ESI"); see also *EEOC v. Mia Aesthetics Clinic, ATL, LLC*, No. 24-cv-3407-MLB-AWH, 2025 WL 2417759, at *6 (N.D. Ga. Aug. 18, 2025) (ordering a vendor after finding technical incompetence). The Court should order Bans to retain a qualified e-discovery vendor to collect and produce responsive information from Bans's email accounts, text messages, and any other platform it uses to run the business.

## CONCLUSION

BMO should not have had to ask twice. For these reasons, the Court should grant this Motion and:

(1) Order Bans to immediately produce all responsive ESI;

(2) Order Bans, at its own expense, to retain a qualified e-discovery vendor to collect and produce responsive ESI;

(3) Award BMO its fees and costs incurred in securing Bans's compliance with its ESI-discovery obligations and permit BMO to submit a fee petition within fourteen days after entry of an award granting that relief;

(4) Enter any fee and cost award jointly and severally against Bans and its counsel; and

(5) Award such other relief as is just and proper.

Dated: September 2, 2026

Respectfully Submitted,

Jeffrey Jamison

/s/ Jeffrey Jamison
One of BMO's Attorney

Jeffrey Jamison
Meredith Pike
BMO Financial Group

320 S. Canal Street – Floor 7
Chicago, Illinois 60606
Telephone: (312) 461-4694
Jeffrey.Jamison@bmo.com

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

The undersigned counsel for Defendant/Counter-Plaintiff BMO Bank N.A. certifies that BMO Bank N.A.'s Motion to Compel and for Sanctions complies with the applicable word limit. In reliance on the word-count function of the word-processing system used to prepare the Motion, and exclusive of the case caption, title, any table of contents, signature block, and certificates, the Motion contains 3,386 words.

/s/ Jeffrey E. Jamison

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that the aforementioned document was filed through the Court's electronic filing system and served on Plaintiffs' counsel via email on September 2, 2026. Parties of record may obtain a copy through the Court's CM/ECF system.

/s/ Jeffrey E. Jamison